1
2
3
4
5
6               **UNITED STATES DISTRICT COURT**
7                      **DISTRICT OF NEVADA**
8
9    BROOKEY LEE WEST,
            *Petitioner*,                          2:07-cv-00021-KJD-GWF
10
     vs.                                           ORDER
11
12   SHERYL FOSTER, *et al.*,
13          *Respondents*.
14

15       This habeas matter under 28 U.S.C. § 2254 comes before the Court for a decision on

16   the merits on the multiple grounds presented, including petitioner's challenge to the

17   sufficiency of the evidence as to proof that the victim died by way of criminal agency.

18                                    ***Background***

19       Petitioner Brookey Lee West seeks to set aside her 2001 Nevada state conviction,

20   pursuant to a jury verdict, of first-degree murder.  She is serving a life sentence without the

21   possibility of parole.

22       The Supreme Court of Nevada set forth a detailed summary of the trial evidence in its

23   published decision.  See *West v. State*, 119 Nev. 410, 411-15, 75 P.3d 808, 809-12 (2003).

24   The parties do not challenge the accuracy of the state supreme court's recital, which is

25   presumed to be correct unless shown to be incorrect by clear and convincing evidence.

26   *See,e.g., Sims v. Brown*, 425 F.3d 560, 563 n.1 (9th Cir. 2005).

27       In broad overview, the decomposing body of West's mother, Christine Smith, was

28   found on February 5, 2001, in a storage unit in Las Vegas in a plastic garbage can that had

1   been sealed with duct tape, garbage bags, and cellophane wrap.  Smith's body was

2   discovered after the general manager responded to complaints of a foul smell, investigated

3   and himself smelled a foul odor emanating from the unit, opened the unit and observed the

4   garbage can with a substance oozing out, and then called the police.[1]

5       Trial witnesses had last seen Christine Smith alive approximately three years earlier

6   in February 1998.  At that time, Smith told a neighbor that she was going to live with her son

7   Travis Smith, Jr. and his girlfriend in their apartment in California.  However, Smith had told

8   the neighbor on a prior occasion that Travis was a homeless drug addict.  Prosecution

9   investigators were not able to locate Travis Smith, Jr. during their investigation in 2001.

10      During and after February 1998, until the discovery of her mother's body, West

11   continued to maintain that she had taken her mother to live with Travis in California and that

12   Smith continued to live there.  A neighbor who helped West move out of Smith's apartment

13   after Smith purportedly had left observed, however, that a valuable ring and wool cap that

14   Smith had worn every day still were in the apartment.

15      The storage unit had been rented in the names of Brookey West and Christine Smith

16   beginning on June 26, 1998.  The rental payments for the unit were made by West.  She last

17   accessed the unit on November 16, 2000, prior to the discovery of the body on February 5,

18   2001.[2]

19      / / / /

20   _____

21      [1]The additional factual background in the text that is not specifically set forth in the state supreme
     court summary can be found in #21, Ex. 28, at 11-15.

22
23      This Court makes no credibility findings or other factual findings regarding the truth or falsity of
     evidence or statements of fact in the state court.  The Court summarizes same solely as background to the
24   issues presented in this case, and it does not summarize all such material.  No statement of fact made in
     describing statements, testimony or other evidence in the state court constitutes a finding by this Court.

25      The significance of additional specific evidence or categories of evidence relied upon by petitioner in
26   support of her claims is discussed in the discussion of the particular claims.  The present brief factual recital
     constitutes only a broad overview for context.  Any absence of mention of a specific piece of evidence or
27   category of evidence in this broad overview does not signify that this Court has overlooked or ignored such
     evidence in considering petitioner's claims.

28      [2]The additional factual detail not reflected in the state court opinion is found in #21, Ex. 28, at 16-23.

The defense stipulated at trial that West admitted placing her mother's body in the storage unit.

The forensic pathologist testified that Smith's body had been sealed in the garbage can for a minimum of six months and likely for "much longer than six months," with his impression being that "it had been at least a year."  The forensic entomologist testified that, taking into account the type of maggots found inside the garbage can with the body, Smith's body was placed in the garbage can within eight hours of her death.  Rigor mortis would not set in until four to eight hours after death, peaking at approximately twelve hours, so rigor would not necessarily impede placing a body in a trash can during that time frame.[3]

When Smith's body was discovered in the garbage can, a white plastic bag covered her face from the bridge of her nose, about midway up over the orbital sockets, to her chin. The bag was tied in a knot behind her head at the base of her neck.  A hair was caught in the knot, potentially consistent with the knot having been tied hastily.  The bag was tied tightly and would have been even tighter before decomposition.  The forensic pathologist could not testify whether the plastic bag had been placed on Smith's face before or after her death, and he could not rule out the possibility that the bag originally had covered her eyes and then slipped or slid down her face during decomposition.[4]

The forensic pathologist could not determine the cause and manner of Smith's death because of the advanced decomposition of the body.  He testified that the presence of the plastic bag over Smith's face was consistent with suffocation, but he was unable to determine that Smith died by suffocation due to the decomposition of the body.  He testified that it was possible that Smith was placed in the airtight garbage can while still alive.

/ / / /

---

[3]The additional factual detail not reflected in the state court opinion is found in #22, Ex. 30, at 25-26 & 46-50; *id.*, Ex. 31, at 25-27.

[4]The additional factual detail not reflected in the state court opinion is found in #22, Ex. 30, at 28-32; *id.*, Ex. 31, at 28-36 (forensic pathologist); *id.*, Ex. 31, at 70-72 (crime scene analyst); *id.*, Ex. 32, at 4-15 (crime scene analyst).

1    Smith's death also was consistent with natural causes.  The forensic pathologist could

2  not rule out a possible heart attack.  At the time of her death, Smith was approximately 64

3  years of age with asthma and moderate obstruction in her lungs, with respiratory testing – at

4  one of two tests taken – reflecting a "lung age" of 132 years.  A neighbor testified that Smith

5  appeared very ill and lethargic when she last saw her in February 1998.

6    Numerous ATM withdrawals were made from Smith's Las Vegas bank account after

7  she was last seen by trial witnesses in February 1998 and prior to the time that police

8  discovered her body in February 2001.  The withdrawals in Las Vegas were made from

9  automated teller machines in convenience stores, and a visual record of such a withdrawal

10 would not be preserved on a video recording.  Smith's social security payments regularly were

11 direct-deposited to the account during this time.[5]

12    Some trial witnesses testified that Smith and West had a good mother-daughter

13 relationship.  Other witnesses testified that West had a strained relationship with Smith, with

14 West calling her mother controlling and a sociopath.

15                           ***Governing Standard of Review***

16    The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly

17 deferential standard for evaluating state-court rulings."  *Lindh v. Murphy*, 521 U.S. 320, 333

18 n. 7, 117 S.Ct. 2059, 2066 n.7,138 L.Ed.2d 481 (1997).  Under this deferential standard of

19 review, a federal court may not grant habeas relief merely on the basis that a state court

20 decision was incorrect or erroneous.  *E.g., Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir.

21 2003).  Instead, under 28 U.S.C. § 2254(d), the federal court may grant habeas relief only if

22 the decision: (1) was either contrary to or involved an unreasonable application of clearly

23 established federal law as determined by the United States Supreme Court; or (2) was based

24 on an unreasonable determination of the facts in light of the evidence presented in the state

25 court.  *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003).

26

27    _____

28         [5]The additional factual detail not reflected in the state court opinion is found in #22, Ex. 33, at 133-38; #23, Ex. 35, at 36, 122-28, 151-52 & 157-59; *id.*, at 162-69; #24, Ex. 37, at 121-22 & 136-38.

1    A state court decision is "contrary to" law clearly established by the Supreme Court only

2    if it applies a rule that contradicts the governing law set forth in Supreme Court case law or

3    if the decision confronts a set of facts that are materially indistinguishable from a Supreme

4    Court decision and nevertheless arrives at a different result.  *E.g., Mitchell,* 540 U.S. at 15-16,

5    124 S.Ct. at 10.   A state court decision is not contrary to established federal law merely

6    because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has

7    held that a state court need not even be aware of its precedents, so long as neither the

8    reasoning nor the result of its decision contradicts them.  *Id.*  Moreover, "[a] federal court may

9    not overrule a state court for simply holding a view different from its own, when the precedent

10   from [the Supreme] Court is, at best, ambiguous."  *Mitchell*, 540 U.S. at 17, 124 S.Ct. at  11.

11   For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme

12   Court precedent is not contrary to clearly established federal law.

13   A state court decision constitutes an "unreasonable application" of clearly established

14   federal law only if it is demonstrated that the state court's application of Supreme Court

15   precedent to the facts of the case was not only incorrect but "objectively unreasonable."  *E.g.,*

16   *Mitchell*, 540 U.S. at 18,124 S.Ct. at 12; *Davis v. Woodford*, 333 F.3d 982, 990 (9th Cir. 2003).

17   To the extent that the state court's factual findings are challenged intrinsically based

18   upon evidence in the state court record, the "unreasonable determination of fact" clause of

19   Section 2254(d)(2) controls on federal habeas review.  *E.g., Lambert v. Blodgett*, 393 F.3d

20   943, 972 (9th Cir. 2004).  This clause requires that the federal courts "must be particularly

21   deferential" to state court factual determinations.  *Id.*  The governing standard is not satisfied

22   by a showing merely that the state court finding was "clearly erroneous."  393 F.3d at 973.

23   Rather, the AEDPA requires substantially more deference:

24   . . . . [I]n  concluding that a state-court finding is unsupported by
     substantial evidence in the state-court record, it is not enough that
25   we would reverse in similar circumstances if this were an appeal
     from a district court decision. Rather, we must be convinced that
26   an appellate panel, applying the normal standards of appellate
     review, could not reasonably conclude that the finding is
27   supported by the record.

28   *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.  If

1  the state court factual findings withstand intrinsic review under this deferential standard, they

2  then are clothed in a presumption of correctness under 28 U.S.C. § 2254(e)(1); and they may

3  be overturned based on new evidence offered for the first time in federal court, if other

4  procedural prerequisites are met, only on clear and convincing proof.  393 F.3d at 972.

5      The petitioner bears the burden of proving by a preponderance of the evidence that

6  he is entitled to habeas relief.  *Davis*, 333 F.3d at 991.

7                                   ***Discussion***

8      ***Ground 1:   Sufficiency of the Evidence***

9      In Ground 1, petitioner alleges that she was denied her right to due process in violation

10  of the Fifth, Sixth and Fourteenth Amendments because the evidence was insufficient to

11  prove beyond a reasonable doubt the essential element of the offense that Christine Smith's

12  death occurred by the criminal agency of another person.

13      In its published decision, the Supreme Court of Nevada rejected the claim presented

14  to that court on the following grounds:

16          West contends that there was insufficient evidence
17      adduced at trial to establish that Smith died as the result of a
        criminal act rather than natural causes.   Accordingly, West
18      asserts that her murder conviction must be reversed.   We
        disagree.

19          [2][3] The corpus delicti rule in Nevada is well established.
        To prove that a murder has been committed, the State must
20      demonstrate: "(1) the fact of death, and (2) that death occurred by
        criminal agency of another."  At trial, the State bears the burden
21      of establishing the corpus delicti beyond a reasonable doubt,
        based on direct or circumstantial evidence.  When reviewing the
22      sufficiency of the evidence, we consider "'whether, after viewing
        the evidence in the light most favorable to the prosecution, any
23      rational trier of fact could have found the essential elements of
        the crime beyond a reasonable doubt.'"  West argues that there
24      was less proof of death by criminal agency in her case than in the
        previous cases in which this court reversed based on insufficient
25      evidence of corpus delicti, namely, *Frutiger v. State*, *Hicks v.
        Sheriff*, and *Azbill v. State*.

26          [The court then discusses the particular facts presented
        respectively in *Frutiger*, *Hicks*, and *Azbill*.]
27
28          [4]  We disagree with West that the above cases support
        her contention that there was insufficient evidence of corpus

delicti in the instant case, especially in light of our recent decision in *Middleton v. State*.[FN19]  In *Middleton*, we noted that " 'there is no requirement that there be evidence of a specific cause of death.'"  And, "'[t]he court must consider and weigh all the evidence offered which bears on the question of death by criminal agency.'"  Using this standard, we upheld David Stephen Middleton's murder convictions, concluding that although the victims' actual causes of death could not be determined from examination of the bodies due to decomposition, "'the circumstances of the disappearances of the women, the discoveries of their bodies in remote locations, tied with rope, wrapped in garbage bags, bitten severely, clearly creates a reasonable inference of their deaths by criminal agency.'"  Accordingly, the State may establish corpus delicti solely with circumstantial evidence, notwithstanding the lack of a body or lack of evidence of the actual cause of death due to decomposition or dismemberment of the body.

FN19. 114 Nev. 1089, 968 P.2d 296 (1998).

In considering the weight of the evidence in the present case, we conclude that there was sufficient evidence of corpus delicti, notwithstanding the fact that the actual cause of Smith's death could not be determined.  Similar to *Middleton*, the circumstances of Smith's disappearance, the discovery of her body in a garbage can that was sealed with great effort to make it airtight and located in a storage unit that West rented, the admission that West put Smith in the garbage can, and the discovery of the plastic bag that covered Smith's nose and mouth, clearly created a reasonable inference of Smith's death by criminal agency.  Although Smith and West informed Smith's friends and neighbors that West was taking Smith to California to live with Travis Jr., several witnesses testified that Smith left behind several personal items when she disappeared, and there was evidence that Travis Jr. was a recluse.  Finally, even though West presented medical evidence that Smith may have died by natural causes, the jury was at liberty to weigh this evidence along with the evidence that Smith died by criminal agency.[FN24]

FN24. *See Middleton*, 114 Nev. at 1102-03, 968 P.2d at 306 (noting that when there is conflicting testimony at trial, the jury, and not this court, determines the weight and credibility of the testimony).

119 Nev. at 415-18, 75 P.3d at 812-14 (citation footnotes 2-18 & 20-23 omitted).

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

On a challenge to the sufficiency of the evidence, the habeas petitioner faces a "considerable hurdle."  *Davis v. Woodford*, 333 F.3d 982, 992 (9th Cir. 2003).  Under the

standard announced in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the jury's verdict must stand if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *E.g., Davis*, 333 F.3d at 992. Accordingly, the reviewing court, when faced with a record of historical facts that supports conflicting inferences, must presume that the trier of fact resolved any such conflicts in favor of the prosecution and defer to that resolution, even if the resolution by the state court trier of fact of specific conflicts does not affirmatively appear in the record. *Id.* The *Jackson* standard is applied with reference to the substantive elements of the criminal offense as defined by state law. *E.g., Davis*, 333 F.3d at 992. When the deferential standards of the AEDPA and *Jackson* are applied together, the controlling question for decision on federal habeas review thus becomes one of whether the Nevada Supreme Court's decision reflected an unreasonable application of the *Jackson* standard to the evidence presented at trial. *See,e.g., Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005).

In the present case, petitioner focuses at length upon evidence pertaining to cause of death. Petitioner points to: (a) the absence of testimony from the forensic pathologist establishing the cause of death to a medical certainty; (b) expert testimony finding no forensic or medical evidence consistent with various forms of homicide – other than suffocation – such as shooting, stabbing, or blunt force trauma; and (c) expert testimony acknowledging that the evidence available also was at least not inconsistent with possible alternative natural causes of death associated with Christine Smith's general age, medical conditions, and/or statistically possible complications from her medication regime.

Under *Middleton*, however, the State was not required to medically prove the specific cause of death in order to satisfy the *corpus delicti* element under Nevada substantive law. Petitioner thus can delineate each and every facet of the evidence going to the question of cause of death, as she has done at length, and still not demonstrate on federal habeas review that the evidence was insufficient to establish the *corpus delicti* element. Rather, under *Middleton*, the trier of fact was permitted to infer from other circumstances that the decedent

died from criminal agency rather than from natural causes. Those surrounding circumstances in this case included West's admitted hiding of the body in a manner that reflected an intent to avoid detection, the presence of a plastic bag covering the decedent's airways when the body was discovered, evidence supporting an inference that the brother Travis did not have a stable home in California to move the mother to in the first instance, and West's active concealment of her mother's death for years thereafter, right up until the discovery of her body. The Nevada Supreme Court's holding that these circumstances sufficiently supported an inference beyond a reasonable doubt that Christine Smith died from foul play rather than from natural causes was neither contrary to nor an unreasonable application of *Jackson*.

Petitioner further points to variances in or competing inferences that might be drawn from the circumstantial evidence. For example, petitioner relies upon the testimony of a disinterested witness who observed Smith sitting in the car at a time when packed boxes also were visible, with West saying that she was taking her mother to California to live with her brother. Petitioner further points to evidence that she was a successful technical writer who ostensibly had no need for her mother's social security payments.

However, the resolution of conflicts in the evidence and between competing inferences to be drawn from the evidence was a matter committed to the jury. Rational jurors potentially could have concluded that West continued the charade up through the point observed by the witness, with the mother still believing in the deception that she was on her way to stay with her son. Notably, no trial evidence tended to establish that Smith ever was seen thereafter living in California or that her son – in fact – then had an established homestead for her to go to. Further, there was evidence from which a rational trier of fact could conclude that the writing income was not necessarily a tap that West could reliably turn on and maintain whenever she wished.[6] Nor was the State required to prove motive. It is established law, under *Jackson*, that the reviewing courts must presume that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution.

---

[6] See #23, Ex. 36, at 33-36, 61-63, 66-67 & 80-85. See also #21, Ex. 26, at 34-36 (State's opening).

1    The state supreme court's rejection of Ground 1 thus was neither contrary to nor an

2    unreasonable application of clearly established federal law.

3    Ground 1 accordingly does not provide a basis for federal habeas relief.  The Court will

4    grant a certificate of appealability on this claim, however, as jurists of reason would find the

5    issue to be a debatable one.[7]

6

7    [7]Federal habeas counsel adds a new and different claim challenging the sufficiency of  the evidence
     for the first time in the reply that does not appear to have been exhausted on direct appeal.  Counsel alleges

8    that the evidence was insufficient to prove that West committed first-degree murder because the State failed
     to prove that the murder was premeditated, willful and deliberate.  The reply is not a vehicle for amending the

9    petition with new claims.  In order to amend the petition after respondents have answered, petitioner instead
     must file a motion for leave to amend the petition and must demonstrate that such amendment would not be

10   futile due to concerns of, *inter alia*, lack of exhaustion and untimeliness.  Over and above the fact that West is
     represented by counsel who is familiar with the procedural requirements for amending a petition, this Court

11   repeatedly has admonished the Federal Public Defender in prior cases that the reply is not a proper vehicle
     for amending the petition and that the Court will not countenance such attempted improper "sandbagging" in

12   the reply.

13       The Court notes in this regard that the Federal Public Defender has argued in the past that the
     exhaustion requirement is satisfied as to a newly-presented claim because the claim allegedly would be

14   procedurally defaulted in the state courts, as a prelude to then seeking to overcome the procedural default on
     arguments presented for the first time in federal court.  As this Court frequently has noted, however, the

15   standards for excusing a procedural default are substantially the same in Nevada state court as they are in
     federal court.  *See,e.g., Mitchell v. State*, 122 Nev. 1269, 1273-74,149 P.3d 33, 36 (Nev. 2006)(recognizing

16   cause and prejudice as well as actual innocence based exceptions to state procedural bars); *see also
     Robinson v. Ignacio*, 360 F.3d 1044, 1052 n.3 (9th Cir. 2004)(recognizing that Nevada's cause and prejudice

17   analysis and the federal cause and prejudice analysis are nearly identical); *accord Jones v. McDaniel*, 2009
     WL 890915 (9th Cir., Apr. 2, 2009)(in an unpublished disposition, holding that the petitioner had not

18   established futility of exhaustion given the substantial similarity of Nevada state and federal standards to
     overcome a procedural bar).

19

20        Accordingly, this Court will not hold claims to be exhausted on the premise that the claims would be
     procedurally defaulted in the Nevada state courts in the absence of an unequivocal stipulation by petitioner

21   that the unexhausted claims in fact would be denied on state procedural grounds if he returned to state court
     to present the claims.  Any holding of exhaustion on this basis further would be subject to respondents' ability

22   to then seek dismissal of the claims on the basis of procedural default.  Such an unequivocal stipulation, to in
     truth be unequivocal in light of the application of the procedural default rules under Nevada state procedure,

23   would have to include concessions that: (1) petitioner cannot avoid dismissal of the claims in the state courts
     because he cannot demonstrate cause and prejudice in the state courts to overcome the state procedural

24   bars; (2) petitioner cannot avoid dismissal of the claims in the state courts because he cannot demonstrate in
     the state courts that the alleged constitutional violation has probably resulted in the conviction of one who is

25   actually innocent and cannot thereby overcome these procedural bars; and (3) the procedural bars otherwise
     are now consistently applied by the Nevada state courts, such that it is not possible that the state courts, as a

26   discretionary matter, would consider the claims despite the procedural default and despite a failure to
     demonstrate either cause and prejudice or actual innocence.  In the absence of such concessions, the Court

27   will not hold that there is no possibility that the unexhausted claims would be considered by the state courts.

28                                                                                                    (continued...)

                                            -10-

***Ground 2:   Adequate Notice in the Charging Instrument***

In Ground 2, petitioner alleges that she was denied her right to due process in violation of the Fifth, Sixth and Fourteenth Amendments because the information failed to give adequate notice of the charged crime, in that, *inter alia*, the information charged her with murder by "1) . . . asphyxiation, strangulation and/or 2) cause or means unknown."

The Supreme Court of Nevada rejected the claim presented to that court on the following grounds:

> [5]  West next challenges the charging document, arguing that it failed to provide her adequate notice of the State's theory of murder. Because this challenge involves a constitutional issue, we review de novo whether the charging document complied with constitutional requirements.

> [6][7]  Under the Sixth Amendment to the United States Constitution, the State is required to inform the defendant of the nature and cause of the accusation against the defendant.  In accordance with the Sixth Amendment, the Legislature has provided that an information "must be a plain, concise and definite written statement of the essential facts constituting the offense charged." "Conclusory allegations are insufficient." The Legislature has also provided that an information must specify the means by which the charged offense was committed or allege that the means are unknown. The purpose of these requirements is to prevent prosecutors from changing theories mid-trial, which in effect prejudices the defendant in his or her defense.

> On April 26, 2001, the State charged West by information with open murder:

> > That   BROOKEY   LEE   WEST,   the Defendant(s) above named, having committed the crime of MURDER (Open Murder) (Felony-NRS 200.010, 200.030), on or during the year 1998, within the County of Clark, State of Nevada, contrary to the form, force and effect of statutes in such cases made and provided, and against the

---

[7](...continued)

In short, if a petitioner wishes to have a claim considered that was not presented in the petition, as amended, petitioner must comply with the procedure for doing so by seeking leave to amend and then must address any procedural defenses that potentially would render such amendment futile.  When a petitioner disregards the procedure for presenting new claims and instead seeks to bypass such issues by simply inserting the new claim in the reply, this Court disregards the new claim presented for the first time in the reply.  The Federal Public Defender, again, repeatedly has been admonished in this regard.

The new claim raised for the first time in the reply therefore is disregarded.

1
2
3
4

> peace and dignity of the State of Nevada, did then and there wilfully, [sic] feloniously, without authority of law, and with premeditation and deliberation, and with malice aforethought, kill CHRISTINE SMITH, a human being, by asphyxiation by suffocation and/or manner or means unknown.

5
6
7
8
9

> Considering that Smith's body was severely decomposed, we conclude that the State provided West adequate notice in the charging information regarding its theory of murder. The charging information provided that the murder occurred sometime in 1998 and by means of suffocation, asphyxiation, or manner or means unknown. "We are not concerned with whether the information could have been more artfully drafted, but only whether as a practical matter, the information provides adequate notice to the accused." Moreover, contrary to West's contention, the State did not change theories mid-trial.

10 119 Nev. at 419-20, 75 P.3d at 814-15 (citation footnotes omitted).

11  The state supreme court's rejection of this claim was neither contrary to nor an
12 unreasonable application of clearly established federal law.

13  Petitioner maintains that the State changed theories at trial. Petitioner contends
14 specifically that the State promised pretrial that it would rely exclusively on an asphyxiation
15 or strangulation theory and that the State then abandoned this alleged promise at trial by
16 arguing in closing that it did not have to prove the specific cause of death.

17  This argument is directly belied by the state court record. The State's position instead
18 was consistent throughout the proceeding.

19  As noted, the State charged West initially with killing Smith by asphyxiation,
20 strangulation and/or by manner or means unknown.

21  In the hearing relied upon by West, the State's representations, fairly read, indicated
22 only that it would not argue a specific cause other than asphyxiation or strangulation. Nothing
23 in the State's representations reflected an intent to abandon its alternative allegation that
24 Smith was killed by unknown cause or means, as, indeed, the State was *opposing* – in the
25 very same argument – a defense request to strike that alternative allegation.[8] Any defense
26 assumption following the hearing that the State was abandoning the alternative allegation that

27 _____

28  [8]See #21, Ex. 22, at 35-44.

-12-

1  the victim was killed by unknown manner or means would not have been a reasonable one,

2  and petitioner's strained *post hoc* reading of the transcript is unpersuasive.

3       In its opening statement, the State of course was not supposed to be arguing its theory

4  of the case but instead was supposed to be outlining what it believed that the evidence would

5  show.  The State referred in this outline to the evidence regarding the plastic bag found

6  covering Smith's airways.  The State also specifically noted, however, that the medical

7  examiner "pointed out that he could not make, to a degree of medical certainty, that he could

8  not reach a conclusion as to the cause or manner of death."[9]

9       Indeed, defense counsel's argument at the jury charge conference confirmed that the

10  defense understood that the State was maintaining – as the State had maintained from the

11  inception of the case – in the alternative that Smith was killed by suffocation or asphyxiation

12  and/or by manner or means unknown.  In the jury charge conference, defense counsel sought

13  a special verdict and/or instruction specifically directing the jury, if it found West guilty, to

14  specify whether the jury found that she was killed by suffocation or asphyxiation or instead

15  by cause or means unknown.  The defense further sought an advisory instruction, essentially

16  a directed verdict, instructing the jury that the State had not "tendered sufficient evidence to

17  prove death by an unknown cause."[10]  Jury Instruction No. 3, which the defense saw prior to

18  the charge conference, expressly stated that West was charged with murdering Smith "by

19  asphyxiation by suffocation and/or manner or means unknown."[11]  The foregoing all transpired

20  prior to the closing argument where petitioner contends that the State "suddenly"[12] began

21  arguing that it did not have to prove how West killed Smith.

22       Petitioner's argument that the State suddenly shifted theories in this regard without

23  notice thus is belied by rather than supported by the record.  The State alleged and

24  ———————————

25    [9]#21, Ex. 26, at 24.

26    [10]#24, Ex. 40, at 10-16.

27    [11]#24, Ex. 41.

28    [12]#19, at 26, line 6.

1    maintained throughout that the victim was killed by suffocation, asphyxiation and/or other

2    manner or means unknown.  Consistent with its representations prior to trial, the State never

3    sought to prove a specific cause of death other than suffocation or asphyxiation, only

4    maintaining in the alternative that Smith was killed by other manner or means unknown.

5          Moreover, petitioner at bottom is maintaining that the State was required to give notice

6    of something that it in truth was not required to prove – that the victim died from a specific

7    known cause of death rather than from an unknown cause.  As discussed, *supra*, with regard

8    to Ground 1, the State was not required to prove the specific cause of death in order to

9    establish *corpus delicti* under Nevada law.  Nevada statutory law further expressly allowed

10   the State to "allege that the means by which the defendant committed the offense are

11   unknown or that the defendant committed it by one or more specified means."  N.R.S.

12   173.075.  The State invariably maintained – from the information at the very outset of the

13   case consistently through the closing argument – that West killed Smith either by asphyxiation

14   or suffocation or by some other manner or means unknown.

15         The Nevada Supreme Court's rejection of this claim clearly was neither contrary to nor

16   an unreasonable application of clearly established federal law as determined by the United

17   States Supreme Court.

18         Ground 2 therefore does not provide a basis for federal habeas relief.[13]

19

20   _____

21         [13]The state supreme court's implicit rejection of the remaining exhausted aspects of Ground 2
     similarly was neither contrary to nor an unreasonable application of clearly established federal law as
     determined by the United States Supreme Court.

22         Petitioner maintains that the State's witness list included a number of witnesses that the State had no
23   intention of calling.  She contends that an accurate witness list was necessary to prepare a proper defense,
     particularly in light of the allegedly vague charges.  On a non-exhaustive review, the Court was able to
24   determine that at least 28 of the 35 witnesses listed in the main witness list (#20, Ex. 10) in fact were called
     by the State.  The Court's review was non-exhaustive because not every trial transcript volume in the record
25   contains an index of witnesses.  Of the remaining 7 potential witnesses, assuming, *arguendo*, that they in fact
     were not called by the State at trial, the defense called one of the witnesses, and a number of stipulations
26   were entered into during trial that eliminated the need for a number of the witnesses.  See,e.g., #24, Ex. 37,
     at 149-53.  The supplemental witness lists did not expand the list of any uncalled witnesses substantially.

27
         It is subject to substantial question whether even a state law violation of substance was presented in
28                                                                                            (continued...)

                                                      -14-

***Ground 3: Alleged Prosecutorial Misconduct in Closing Argument***

In Ground 3, petitioner alleges that she was denied her right to due process in violation of the Fifth and Fourteenth Amendments because the State engaged in prosecutorial misconduct during closing argument. She alleges in particular that the State's closing argument: (A) improperly invited speculation by the jury as to Smith's cause of death; (B) inappropriately shifted the burden of proof to the defense; (C) invited the jury to convict West without proof of geographical jurisdiction; and (D) made an inappropriate appeal to religious bias.

The Supreme Court of Nevada rejected petitioner's claim of prosecutorial misconduct during closing argument in summary fashion at the end of its published decision, "conclud[ing] that West's contention lacks merit." 119 Nev. at 421, 75 P.3d at 815.

On federal habeas review of a state court conviction for constitutional error, the standard of review for a claim of prosecutorial misconduct, is "'the narrow one of due process, and not the broad exercise of supervisory power'" applied in federal criminal trials. *See, e.g., Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144

---

[13](...continued)
this regard. Clearly what was not presented was any federal constitutional issue of any substance, and petitioner presents no apposite United States Supreme Court authority contrary to the holding of the state supreme court implicitly rejecting this meritless claim. The State indisputably did not bury cause-of-death witnesses in a burdensomely long and over-inclusive witness list that then were sprung upon the defense at trial by surprise. Rather, the cause-of-death testimony proceeded at trial largely as would have been expected by both sides given what the forensic pathologist Dr. Telgenhoff had opined following the autopsy.

This point was a non-issue and certainly a constitutional non-issue. If there in truth were something of substance to the issue, it was incumbent upon petitioner to do more than conclusorily refer merely to the State listing "a number" of witnesses that it allegedly had no intention of calling. The witness list in question hardly was atypical for a first degree murder trial, and it certainly did not impair the ability of the experienced defense counsel to defend the case.

Petitioner further maintains that the information provided inadequate notice because the information alleged that the murder occurred "on or during the year 1998" without further specifying a date or range of dates. Petitioner cites no apposite United States Supreme Court authority contrary to the state supreme court's implicit rejection of this aspect of the claim.

Finally, petitioner's citation to Ninth Circuit authority, particularly pre-AEDPA Ninth Circuit authority, does not establish that the state supreme court's rejection of her claim was contrary to or an unreasonable application of United States Supreme Court authority.

1   (1986)(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40

2   L.Ed.2d 431 (1974)).  "The relevant question is whether the prosecutor['s] comments 'so

3   infected the trial with unfairness as to make the resulting conviction a denial of due process.'"

4   *Id.* (quoting *Donnelly*, 416 U.S. at 643, 94 S.Ct. at 1871).  *Accord Duckett v. Godinez*, 67 F.3d

5   734, 743 (9th Cir. 1995).

6          With this standard in mind, the Court considers each subsidiary claim in turn.

7          ***Ground 3(A)  – Alleged Invitation to Speculate as to Cause of Death***

8          In Ground 3(A), petitioner contends that the State's closing inappropriately invited

9   speculation into the cause and manner of death when the State argued in the closing, *inter

10  alia*, that "[w]e don't have to prove what killed Christine Smith."[14]  Petitioner urges that the

11  State thereby argued "that it did not have to prove corpus delicti."

12         Petitioner's underlying premise on Ground 3(A) is wrong.  Petitioner once again

13  confuses a requirement that the State prove *corpus delicti* with an alleged requirement that

14  the State prove the specific manner in which the murder was committed.  As discussed above

15  as to Ground 1, the State was *not* required to prove the specific manner in which the murder

16  was committed to prove *corpus delicti*.[15]  In both Ground 2 and Ground 3(A), petitioner in

17  essence seeks to impose a requirement on the State "through the back door" that the State

18  did not have in the first instance – of identifying a specific cause of death through criminal

19  agency.  Nevada law quite simply imposed no such burden upon the State of identifying the

20  specific manner by which the murder was committed.  The State thus was not required, with

21  regard to Ground 2, to give notice of only a specific cause of death in the charging instrument;

22  and it was not improper, with regard to Ground 3(A), for the State to argue to the jury that it

23

24  _____

25         [14]See #24-5, Ex. 40, at 118, line 13, through 119, line 18.  In the portions of the argument selectively
    quoted by petitioner in the amended petition and reply, petitioner omits critical contextual statements.  In
26  these omitted statements, the State emphasized that it was required to prove that Brookey West murdered
    her mother and did so intentionally.  See *id.*, at 118, lines 22-25, and 119, lines 16-18.  The prosecutor was
27  pointing out in the passage relied upon by West only that the State was not required to prove specifically how
    West murdered her mother, which, as discussed in the text, was a completely accurate statement of the law.

28         [15]See text, *supra*, at 6-7 & 8-9.

                                                -16-

was not required to prove specifically how Brookey West killed Christine Smith.  It was not improper for the State to so argue *because the State in fact was not required under Nevada law to prove the specific manner in which the murder was committed.*

The Nevada Supreme Court's rejection of Ground 3(A) therefore was neither contrary to nor an unreasonable application of clearly established federal law.[16]

### Ground 3(B) – Alleged Shifting of the Burden of Proof to the Defense

In Ground 3(B), petitioner contends that the State's closing argument inappropriately shifted the burden of proof to the defense when the State: (1) asserted that "[e]ven their own doctor can't tell you exactly what could have caused natural causes, the death of Christine Smith;"[17] (2) stated that "[p]eople don't die of natural causes and wind up looking like that in a logical world," and asking the jury to "think about that bag [over Smith's airways] and consider whether it's [sic] presence is explained by any evidence that's inconsistent with the State's arguments here;"[18] and (3) noted that the defense had introduced a crime scene analyst's fuzzy photograph of a prescription pill bottle allegedly impounded from the crime scene rather than introducing the pill bottle itself with the date clearly reflected on it.[19]

It would be a strange constitutional doctrine indeed that would preclude a prosecutor from directing the jury's attention to what evidence that in fact was introduced by the defense did not show, from asking the jury to consider the significance of a piece of the State's

---

[16]Petitioner did not further pursue in the reply what apparently was a passing statement in the amended petition that the State also invited the state supreme court to speculate as to cause of death in oral argument on direct appeal.  Following upon respondents' motion to dismiss, the Court's prior order directed petitioner – if she intended to pursue the allegation as a claim – to present in the reply argument and apposite authority supporting such a claim as well as proof of exhaustion of the claim.  #44, at 9-10.  Petitioner did not pursue the matter further in the reply, in an apparent implicit recognition that the assertion in the amended petition in this regard in fact was merely a passing statement.  As this Court observed in the prior order, any such claim would appear to clearly lack merit. #44, at 10, lines 10-15.

[17]#24, Ex. 40, at 39.

[18]*Id.*, at 142.  Petitioner does not accurately quote the statements in the trial transcript.  Although the variances are minor, an approximate paraphrase of a statement in the record should not be enclosed in quotes.

[19]*Id.*, at 98-100.  While the photograph in question was taken by a police crime scene analyst, it was introduced by the defense as Defendant's Exhibit F.  See #22, Ex. 29, at 17 & 43-45; #24, Ex. 40, at 91-92.

-17-

1   evidence in the context of the remaining evidence introduced in the case, and from

2   challenging the quality and significance of evidence in fact introduced by the defense.

3   Petitioner cites no apposite United States Supreme Court authority precluding a state

4   prosecutor from doing so on federal constitutional grounds.[20]   Indeed, as respondents

5   correctly note, in federal criminal trials, it is permissible for the prosecution to comment upon

6   a defense failure to call a witness or present certain evidence so long as the prosecution does

7   not comment on the defendant's failure to herself testify.  *See,e.g., United States v. Cabrera*,

8   201 F.3d 1243, 1250 (9th Cir. 2000).  Given the absence of any apposite United States

9   Supreme Court authority supporting petitioner's claim and given the established practice in

10  federal criminal trials, petitioner cannot carry her burden of demonstrating that the Nevada

11  Supreme Court's rejection of Ground 3(B) was either contrary to or an unreasonable

12  application of clearly established federal law.

13           ***Ground 3(C) – Jurisdiction***

14           In Ground 3(C), petitioner alleges that the State failed to prove Nevada jurisdiction over

15  the offense and that, in its closing argument, the State suddenly changed its theory of

16  prosecution, effectively telling jurors that they could convict irrespective of where Smith died.

17           During the charge conference at trial, West requested a jury instruction "that says

18  basically jurisdiction is something that the State must prove in this case" that "would be

19  verbatim from the statute," in N.R.S. 171.020.[21]

20           The state statute referred to provides in full:

21                      Whenever a person, with intent to commit a crime, does
     any act within this State in execution or part execution of such
22   intent, which culminates in the commission of a crime, either

23  _____

24       [20]Petitioner cites to a First Circuit decision in a federal criminal case and to a number of Nevada
     Supreme Court decisions.  See #46, at 20 & n.10.  Even if this Court were to assume, *arguendo*, that any of
25   these decisions were apposite to the facts presented here, petitioner's burden under the AEDPA is to
     demonstrate that the decision of the Supreme Court of Nevada rejecting her claim "was contrary to, or
26   involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme
     Court of the United States*."  28 U.S.C. § 2254(d)(1) (emphasis added).  Petitioner has not even begun to
27   shoulder this burden with citation to apposite United States Supreme Court authority.

28       [21]#24, Ex. 40, at 16 & 17.

within or without this State, such person is punishable for such crime in this State in the same manner as if the same had been committed entirely within this State.

N.R.S. 171.020.

The state district court denied the requested jury charge, stating that "[t]he short answer is that it is a court question and not a jury question." The court indicated that it would entertain a motion to dismiss *nunc pro tunc* if one were made.[22]  None apparently was.

In its closing rebuttal argument, the State, *inter alia*, responded to defense arguments directed to the absence of specific evidence as to when, where or how Smith allegedly was killed.  The State argued:

> Before I go any further I ought to point out that it's really important to remember what the State doesn't have to prove here.  Of course we have to prove some things, but there are things we don't have to prove either.
>
> Please keep this in mind.  We don't have to prove what killed Christine Smith.  We don't have to prove it was suffocation.
>
> We have alleged it was by suffocation or some other unknown means.  We're suggesting and arguing to you that the evidence does show that Brookey West brought about her mother's death, that she did murder her.
>
> We cannot prove, beyond a reasonable doubt, what that instrumentality was, how she did it, but we don't have to.
>
> We also don't have to prove when it happened.
>
> Counsel made a big deal out of that, that maybe she died four months later.  If she did die four months later from February, but her daughter still killed her, that's okay.  That's consistent with what we have alleged.
>
> We've alleged it happened some time in 1998: We don't have to prove the day, don't even have to prove the month.
>
> We don't have to prove where she died, whether it was in the desert, in a motel room, at home.  We don't have to prove that.  We have to prove that it happened.  And that Brook was responsible for it, that she brought it about intentionally.

#24, Ex. 40, at 118-19.

---

[22]#24, Ex. 40, at 17.

-19-

1    Petitioner contends that the State's argument thereby allowed the jury to convict her

2    without the State having to prove jurisdiction.

3    It is established law in Nevada, however, first, that "Nevada jurisdiction over crimes

4    [allegedly] occurring in another state is a question of jurisdiction, not an element of the crime

5    charged," and second, that the question therefore "is a question of law to be decided by the

6    court, not to be submitted to the jury."  *Shannon v. State*, 783 P.2d 942, 948 (Nev. 1989).

7    Petitioner acknowledges that "normally" jurisdiction is left to the court.  She seeks to

8    brush the foregoing established law aside, however, on the basis that the case "presented

9    some unique problems" because the information charged that the crime occurred anytime

10   during 1998.  Petitioner refers to witness testimony as to hearsay statements by West and

11   Smith that West was planning to take her mother to California as evidence that Smith actually

12   went to California, such that she may have died there.[23]

13   Petitioner cites no Nevada law establishing that jurisdiction instead is a question for the

14   jury that the State must prove at trial when a case presents "unique problems" and/or the

15   State does not allege a date certain.  The Supreme Court of Nevada, the final arbiter of

16   Nevada state law, implicitly rejected such a state law argument when it summarily rejected

17   this claim on West's direct appeal.  The established law in Nevada instead is that jurisdiction

18   is a question for the court and is not a matter to be proved by the State before the jury at trial.

19   If petitioner wished to challenge jurisdiction directly – as opposed to indirectly in a challenge

20   to the State's closing argument – the procedure for doing so was clear, as outlined by the

21   state district court during the charge conference.

22   Ground 3(C) is a claim of prosecutorial misconduct based upon *an allegedly improper*

23   *closing argument* by the State depriving petitioner of a fundamentally fair trial.  At bottom, the

24   State's assertion that it did not have to prove to the jury where the crime was committed was

25   completely true.  Jurisdiction was not an element of the offense and was not even a jury issue

26

27   _____

28   [23] In this regard, the defense had to concede in its closing argument that defense witness Steven
     Cornet did not actually see West and Smith leave for California, or anywhere else. #24, Ex. 40, at 72.

-20-

in the first instance.  The State's accurate statement in the closing – as to a jurisdictional issue that was not even before the jury – clearly could not have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Petitioner cites absolutely no authority from the United States Supreme Court indicating that a statement in a closing argument as to such an issue that was even not before the jury gives rise to a federal constitutional violation in any sense.

The Nevada Supreme Court's rejection of Ground 3(C) accordingly clearly was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.[24]

### Ground 3(D) – Alleged Appeal to Religious Bias

In Ground 3(D), petitioner alleges that the State made an inappropriate appeal to religious bias in its rebuttal argument when it characterized defense counsel's reference to the plastic bag found covering Christine Smith's airways as a possible makeshift shroud as being "almost blasphemous."

---

[24] Ground 3(C), again, is a claim based upon an allegedly improper argument in the State's closing. Ground 3(C) does not present a direct challenge to Nevada jurisdiction over the offense.  If petitioner were to present and pursue such a direct challenge on federal habeas review, she would have to, *inter alia*, first exhaust such a claim in state court and then demonstrate that the claim that was exhausted gave rise to a cognizable federal constitutional claim on federal habeas review.

The Court notes in this regard that Christine Smith never was seen alive again by any trial witness, whether in California or elsewhere, after she was last seen in Las Vegas, Nevada  in February 1998, and her decomposing body was found in Las Vegas.  These facts tend to support a fairly strong inference that Smith never left the state prior to her death.  Moreover, N.R.S. 171.020 expressly permits conviction in Nevada for a crime where the commission of the offense culminates in another state where any act is taken within this state in execution or part execution of the intent to commit the crime.  *See,e.g., Shannon*, 783 P.2d at 948 (partially overruling prior case authority limiting the reach of the statute).  The State argued at trial that West presented the story that she was taking Smith to California as a covering ruse to explain the disappearance of her mother prior to instead killing her.  Under that scenario, even if, *arguendo*, West took Smith over the state line into California prior to killing her, jurisdiction arguably would exist under N.R.S. 171.020.  Petitioner presents no case authority establishing that the state courts were required to accept hearsay testimony that West and Smith *said* that West was going to take Smith to California as proof that Smith actually *went* to California before her death.  The hearsay statements do not establish the truth of the matter asserted, particularly when the statements are statements of professed intent or plan, not of then-current fact.

Again, however, Ground 3(C) claims that the State engaged in prosecutorial misconduct in its closing argument.  If petitioner wished to directly challenge Nevada jurisdiction over the offense, it was incumbent upon her to present such a challenge to the state courts via a proper procedure and then demonstrate a federal constitutional basis for review if she sought to pursue the issue further later in federal court.

During the defense closing argument, defense counsel referred to the plastic bag covering Smith's nose and mouth as a "shroud." Counsel referred to the common practice in society of covering the face of a dead person, including examples of a hospital or morgue using a sheet to cover a decedent.[25]

The prosecuting attorney presenting the rebuttal maintained that a shroud was very different from the plastic bag that was found covering Smith's airways. Counsel argued that a shroud covered the entire face and was not tied tightly, as it was simply laid over the body to cover it out of respect. The plastic bag, in contrast, was tied tightly over the victim's airways.[26]

In the course of this argument, the prosecutor said, *inter alia*: "To compare a tightly tied plastic bag to a shroud is almost blasphemous." Defense counsel objected to the "almost blasphemous" comment as a personal attack on counsel. The prosecutor maintained that he was not attacking counsel personally, and the trial court directed that the argument proceed.[27]

The state supreme court's rejection of the claim in Ground 3(D) was neither contrary to nor an unreasonable application of clearly established federal law. The brief verbal sparring between counsel over the prosecutor's remark was a molehill, at best, clearly not a mountain. Petitioner cites no apposite authority from the United States Supreme Court that was contrary to the state court's ruling or that the state supreme court unreasonably applied. The prosecutor clearly did not appeal to the jury during the guilt phase to find West guilty because of her religious affiliation. Nor did the prosecutor appeal to the jury during the guilt phase to convict West based upon religious precepts rather than upon the law given by the trial court and the evidence introduced at trial. Clearly, the prosecutor's remark did not so infect the trial with unfairness as to make the resulting conviction a denial of due process.

Ground 3, including all subparts, thus does not provide a basis for habeas relief.

---

[25]#24, Ex. 40, at 77-78.

[26]*Id.*, at 141.

[27]*Id.*, at 141-42.

### Ground 4: Effective Assistance of Counsel

In Ground 4, petitioner alleges that she was denied her right to effective assistance of counsel under the Sixth and Fourteenth Amendments because: (A) trial counsel failed to subpoena, review and present California medical records for Christine Smith from 1996, from prior to her living in Nevada in 1998; and (B) trial counsel failed to have Smith's medical records from Southwest Medical Associates in Nevada reviewed and explained by an expert witness at trial.

On a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  She must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice.  On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time.  The  court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct.  On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

### Ground 4(A): Effective Assistance – California Medical Records

In Ground 4(A), petitioner alleges that she was denied effective assistance because trial counsel failed to subpoena, review and present California medical records for Christine Smith from 1996.  She alleges in particular that the California medical records contradicted testimony by Nurse Practitioner Judy Zito-Prey that Smith did not have a medical condition in Nevada in January 1998 that indicated that she was about to die of natural causes.  Petitioner alleges that the California medical records contradicted Zito-Prey's testimony because the records allegedly reflected that Smith had chronic obstructive pulmonary disease and an enlarged heart.

Expert medical testimony from the trial related to this claim included the following.

-23-

1      Nurse Practitioner Judy Zito-Prey testified, *inter alia*, as follows.[28]  She saw Christine

2  Smith at Southwest Medical Associates in Nevada for a total of five visits from April 1, 1997,

3  through January 5, 1998.  Smith reported, *inter alia*, a history of adult onset asthma when she

4  presented initially at the first office visit on April 1, 1997; and she was seeking a renewal of

5  her prescription for asthma.  She reported that she had stopped smoking ten years before.

6  Smith reported mild shortness of breath on exertion.  Zito-Prey requested that Smith execute

7  a release for her prior medical records from California, but Smith either never did so or the

8  records were not obtained.[29]

9      Two pulmonary function tests, or spirometry readings, of Smith's respiratory ability

10  were done at Southwest Medical.  The first, conducted in January 1997, before Zito-Prey was

11  established as Smith's primary care provider, reflected a "lung age" of approximately 132

12  years.  The second, conducted in April 1997, reflected a lung age of approximately 103 years.

13  The findings were consistent with Smith's report of a prior history of smoking.  Smith exhibited

14  moderate obstruction, which potentially was attributable to the reported asthma.[30]

15      Zito-Prey started Smith on a Maxair autoinhaler for asthma attacks.  A few weeks later,

16  she added a Vanceril inhaler as a preventative after Smith had a flare-up.[31]

17      Smith's heart rate and blood pressure were within normal limits for a woman of her

18  age.  Zito-Prey did not ascertain the presence of any heart problems from her examination.[32]

19      / / / /

20

21      [28]A nurse practitioner, or advanced practitioner of nursing, may engage, after designated education,
in selected medical diagnosis and treatment in direct patient care and in certain circumstances may prescribe

22  medication.  See N.R.S. 632.237.  In Zito-Rey's case, she had been a nurse practitioner for twenty-one years
at the time of the trial, after obtaining a bachelors in nursing and attending a two year program at a medical

23  school.  She was certified in adult medicine, which encompassed internal medicine.  Zito-Prey was qualified
and licensed by her training and certification to render a diagnosis and prescribe certain kinds of medication.

24  See #23, Ex. 35, at 3-25 (outside the presence of the jury) & 28-33 (before the jury).

25      [29]#23, Ex. 35, at 34-36, 39, 47-48, 54 & 58-59.

26      [30]*Id.*, at 36-41 & 73-76.

27      [31]#23, Ex. 35, at 38-40.

28      [32]*Id.*, at 45-46, 57 & 86.

-24-

1    Zito-Prey's overall diagnostic impression was that Smith suffered from mild asthma and

2    a number of other minor ailments, which are unrelated to the specific allegations made in

3    Ground 4(A).  Nothing from the visits indicated to Zito-Prey as of the last visit on January 5,

4    1998, that Smith was about to die of any known natural cause.[33]

5    Zito-Prey acknowledged that a Maxair inhaler could in rare cases cause paradoxical

6    bronchiospasms and other complications that potentially could be life-threatening.  She further

7    acknowledged that the moderate obstruction reflected by the pulmonary function testing also

8    could result from, *inter alia*, an allergic reaction or congestive heart failure.  Smith, however,

9    did not exhibit the additional symptoms that would accompany congestive heart failure, such

10   as swelling of the feet and ankles.[34]

11   The forensic pathologist, Dr. Gary D. Telgenhoff, M.D., testified, *inter alia*, that Smith's

12   arteries were decomposed but present at the time of the autopsy, and there was no

13   calcification that would indicate hardening of the arteries.  He could not rule out through the

14   autopsy, however, the possibility that Smith died of a heart attack or other heart disease.[35]

15   Dr. Telgenhoff similarly acknowledged that the Maxair inhaler and the Vanceril inhaler

16   could cause potentially life-threatening complications in rare cases.[36]

17   Dr. Telgenhoff also testified that the spirometry readings reflected a 132 lung age at

18   one point and that Smith had moderate pulmonary obstruction.  In cases of severe asthma,

19   an asthma attack, or status asthmaticus, could cause death, but Smith's records from

20   Southwest Medical Associates reflected moderate rather than severe asthma.  Dr. Telgenhoff

21   testified that the pulmonary function tests additionally reflected restriction on inspiration.  Such

22   a restriction could be consistent with a number of potential causes, including congestive heart

23   failure preventing the lungs from expanding fully.  #22, Ex. 31, at 11-18.

24   --------------------

25   [33]*Id.*, at 60-61.

26   [34]*Id.*, at 68-72, 76-77 & 85-86.

27   [35]#22, Ex. 30, at 34-35; *id.*, Ex. 31, at 21.

28   [36]*Id.*, at 69-73; *id.*, Ex. 31, at 5-11.

-25-

1    The defense medical expert, family practitioner Dr. James Anthony, M.D., similarly
2    testified that the Southwest Medical pulmonary function testing reflected moderate obstruction
3    on expiration and a restrictive defect on inspiration.  Dr. Anthony would have pursued the
4    condition with more aggressive medical treatment than did Nurse Practitioner Zito-Prey.  Dr.
5    Anthony testified that the restrictive defect on inspiration was consistent with a number of
6    potential causes, including possibly an enlarged heart or pleural effusion associated with
7    congestive heart failure.  The symptoms would include shortness of breath on minimal
8    exertion and swelling of the legs.  He further testified consistently with the other health care
9    providers as to the potential complications from use of asthma inhalers in rare cases.[37]

10    On state post-conviction review, petitioner attached documents with a supporting brief
11    that she maintained were California medical records for Christine Smith that she obtained by
12    subpoena.  The Court will discuss the particular content of the material tendered by West in
13    the state courts *infra*.

14    After holding an evidentiary hearing on this claim, the district court denied relief.

15    On the state post-conviction appeal, the Supreme Court of Nevada rejected the claim
16    presented to that court on the following grounds:

17
18    . . . [A]ppellant claimed that her counsel was ineffective for failing to have the victim's medical records from California subpoenaed, reviewed, and explained to the jury at trial. Appellant asserted that this information would have bolstered her defense of death by natural causes by demonstrating that the victim was very ill prior to her death and contradicting the nurse practitioner's trial testimony.

21    Appellant failed to demonstrate that her counsel was ineffective.  At the evidentiary hearing, counsel testified that although his team followed some leads and attempted to obtain the California medical records, they were unable to obtain the records prior to trial.  The record indicates that appellant's recent medical records from Nevada were introduced and admitted as exhibits at trial.  Counsel had a medical expert testify on appellant's behalf at trial, and that expert testified that his review

26

27    _____
[37]#24, Ex. 39, at 27-43, 48 & 57-69.  The court reporter transcribed "pleural effusion" as "pleura fusion," but it is clear from the context that the physician would have been referring to pleural effusion, an increase in fluid in the space enveloping the lungs often associated with congestive heart failure.

of the Nevada medical records indicated that the victim was very ill and suffered from severe lung disease prior to her death. This testimony contradicted the nurse practitioner's testimony that was presented earlier in the trial. The defense's expert also testified that, although very rare, death was a possible side effect of one of the medications the victim was taking for her asthma. The district court found that appellant's counsel "rigorously cross-examined the State's witnesses regarding the victim's medical history," and the "introduction of the more recent medical records from Nevada significantly diminished the relevance of any older medical records from California." The district court also found that appellant's counsel was not ineffective. We conclude that the district court's determination was supported by substantial evidence and was not clearly wrong. Accordingly, we conclude the district court did not err in denying this claim.

#29, Ex. 121, at 2-3.

On federal habeas review, petitioner alleges specifically that "Smith's California medical records depicts a diagnosis of Chronic Obstructive Pulmonary Disease (COPD) and a heart condition which is demonstrated by an abnormal ECG showing an enlarged heart." Petitioner urges that the California records "could have changed the outcome at trial" because the records allegedly demonstrated that Nurse Practitioner Zito-Prey's assessment that Smith had asthma and that there was nothing to indicate that she was about to die of natural causes was "an inappropriate diagnosis."[38]

Federal habeas counsel supported the foregoing allegations with the following record citation: "Ex. 66 at 7J." #19, at 32, line 12. No California medical records are found at that single page cited. That single page instead is a page from West's state petition presenting argument on an unrelated claim.

There otherwise is no citation to the California medical records or discussion of their specific content in the amended petition or reply. The Court had to search page by page through state court record materials to find the California medical records.

What the Court ultimately found was nine pages of purported California medical records from late 1996 embedded within another 32 pages of handwritten commentary as to their purported medical significance. The purported medical commentary was generated by

---

[38]#19, at 32.

the lay, *i.e.*, lay in not in any sense being a qualified medical expert, and hardly disinterested petitioner serving a life sentence without the possibility of parole for first-degree murder.[39]

Only two pages from the alleged medical records[40] have any bearing upon the specific allegations presented on federal habeas review within Ground 4(A).[41]

A purported radiology report from an October 10, 1996, chest x-ray states:

> There is moderately enlarged hyperinflation, consistent with chronic obstructive pulmonary disease. There is mild bibasilar atelectasis noted. The thoracic spine shows fairly marked osteoporosis with mild compressive changes in the lower thoracic spine noted.
>
> IMPRESSION:    Marked chronic obstructive pulmonary disease and other age related changes. Mild bibasilar atelectasis. Otherwise, negative study.

#26-2, Ex. 76, Part 3, at electronic docketing page 40.

The foregoing radiology report does not demonstrate that Nurse Practitioner Zito-Prey failed to diagnose a condition threatening Christine Smith with imminent death. The medical testimony at trial, including that by the defense medical expert, reflected that asthma is a form of obstructive pulmonary disease and that the Nevada pulmonary testing showed moderate obstruction.[42]  More to the point, a radiology report is a report of x-ray findings, not a report by a treating primary care provider or pulmonary specialist assessing the significance of the results in diagnosing and treating a patient after examining the patient and considering

---

[39] See #26-2, Ex. 76, Part 3, at electronic docketing pages 22 through 62.

[40] The Court has assumed, *arguendo*, that the purported medical records are authentic. The Court has not been presented with any indication, however, that the purported records have been authenticated in either state or federal court. It instead appears that the documents currently in the state court record were first tendered in the state courts directly by an interested party in the litigation rather than introduced through a proper records custodian. While the Court has assumed *arguendo* that the records are authentic, it has been provided no reliable assurance that they in fact are authentic.

[41] The remaining largely unremarkable records consist of a one-page patient history intake form, with handwritten notes; three pages of checkoff treatment plan sheets with checkoffs and/or handwritten notes directing, *e.g.,* certain lab work; two pages of urinalysis lab results, and a radiology report of a CT scan of the brain.

[42] See, e.g., #22, Ex. 31, at 15-16 (Dr. Telgenhoff); #24, Ex. 39, at 22 & 30 (Dr. Anthony).

possible differential diagnoses.  That is, a radiology report is a diagnostic tool, not itself a diagnosis by a treating physician.  Petitioner has tendered absolutely no competent medical evidence in any way tending to establish that any of the findings in the radiology report reflected that the victim was in imminent peril of dying from natural causes.  The lay and not disinterested petitioner cobbled together in her handwritten submission in state court purported excerpts from medical texts in an effort to demonstrate that the California medical records indicated that Christine Smith was on the verge of death from multiple possible causes.  Brookey West, however, is in no sense competent to provide expert medical testimony or evidence in either state or federal court.

Similarly, the remaining page from the medical records does not demonstrate by competent evidence that Smith had an enlarged heart or that, if she did, she was in imminent peril of dying from health risks associated with such a condition.  The remaining page is not a report by a competent medical expert opining as to the significance of electrocardiogram results.  The page instead is a page of raw results from the electrocardiogram – i.e., the page with the irregular lines generated by the recording pens or other means during the electrocardiogram.[43]  The page does not include any written material interpreting the results by a qualified medical professional.  The interpretation of what the electrocardiogram results purportedly meant was provided, once again, by the lay and not disinterested petitioner, Brookey West.  Petitioner, again, is not a competent witness to provide expert medical testimony, including interpreting electrocardiogram results.  Moreover, an electrocardiogram, like a radiology report, is a diagnostic tool, not a diagnosis.  Petitioner has tendered no competent medical evidence tending to establish that the electrocardiogram results reflected that Smith was facing probable imminent death from natural causes due to an enlarged heart in 1996 or thereafter.

Petitioner accordingly has failed to demonstrate that the decision of the Supreme Court of Nevada rejecting the claim in federal Ground 4(A) was either contrary to or an

---

[43]#26-2, Ex. 76, Part 3, at electronic docketing page 34.

1  unreasonable application of *Strickland*.  This Court would reach the same result on *de novo*

2  review, as petitioner has not tendered competent medical evidence supporting the allegations

3  made regarding the claimed import of the purported California medical records.  Nor has

4  petitioner demonstrated that the prerequisites under the AEDPA for a federal evidentiary

5  hearing have been satisfied.

6       Ground 4(A) thus does not provide a basis for federal habeas relief.[44]

7       ***Ground 4(B): Effective Assistance – Southwest Medical Lab Results***

8       In Ground 4(B), petitioner alleges that she was denied effective assistance because

9  trial counsel failed to have an expert review lab results in the Southwest Medical Associates

10  medical records from Christine Smith's care in Nevada referred to above in Ground 4(A).

11       Petitioner alleges that the Southwest Medical records "contain lab tests that show

12  negative results" and that "present a picture of a very ill patient."[45]  However, once again,

13  federal habeas counsel does not cite to or discuss the specifics of any particular lab results

14  based upon competent medical evidence as to their significance.  In support of the allegations

15  in Ground 4(A), counsel provides only the following record citation:  "Ex. 75."[46]  No medical

16  records are found in that record exhibit.  The record exhibit instead is an amended state court

17  petition filed by petitioner in which she alleges that the Southwest Medical records "contain

18  lab results that show negative results" and "present a picture of a patient who is very ill."[47]

19       / / / /

20

21       [44]Petitioner refers to testimony by defense counsel at the state court evidentiary hearing purportedly
22  asserting that there "may have been" something in the California records that he should have presented to an
   expert for review before trial.  Defense counsel obviously was confused, however, as to which records came
23  from California.  He immediately stated that "I'm basing that on what I'm hearing from Ms. West about this
   blood work."  See #27, Ex. 86, at 27-28.  The blood work, however, was the subject not of the California
24  records but instead of the *Nevada* records that are the subject of Ground 4(B).  In all events, however,
   whether confused or not, defense counsel's evidentiary hearing testimony as to what "may have been" helpful
25  is not controlling in determining prejudice under *Strickland*.

26       [45]#19, at 32.

27       [46]#19, at 32.

28       [47]#25, Ex. 75, at 7H.

1    Petitioner has the burden of proof in seeking federal habeas relief.  Merely parroting

2   back the allegations of a lay petitioner (again, lay in not being a qualified medical expert) in

3   the state courts as to the alleged significance of lab test results does not come even remotely

4   close to carrying that burden.  Whatever Brookey West may have said in the state courts as

5   to the alleged significance of the Southwest Medical lab results has absolutely no bearing on

6   the issue because she is not a competent witness to provide expert medical testimony.  If

7   federal habeas counsel is not going to even begin to address the significance of actual

8   specific lab results -- with appropriate record citation to properly authenticated evidence and

9   supporting *competent* medical evidence as to the significance of the specific lab results vis-à-

10  vis cause of death -- this Court readily reaches the conclusion that Ground 4(B) does not

11  provide a basis for federal habeas relief.  The Court reaches this conclusion, on the minimal

12  showing and argument made, whether under deferential AEDPA review or instead on *de novo*

13  review.  At bottom, the claim as presented on federal habeas review simply is not supported

14  by citation to competent medical evidence.

15    Ground 4(B) thus does not provide a basis for federal habeas relief.[48]

16    ***Consideration of Possible Issuance of a Certificate of Appealability***

17    Under Rule 11 of the Rules Governing Section 2254 Cases, the district court must

18  issue or deny a certificate of appealability (COA) when it enters a final order adverse to the

19  applicant.  A district court order granting or denying a certificate of appealability does not

20  eliminate the requirement that the petitioner must file a timely notice of appeal in order to

21  appeal the court's judgment.  A motion to reconsider the order regarding a certificate of

22  appealability does not extend the time to appeal.

23    / / / /

24

25    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26  [48]Trial counsel's testimony at the state evidentiary hearing as to whether having an expert review the records "may have been helpful" again is not controlling in determining prejudice under *Strickland*.  See note

27  44, *supra*.  Petitioner not only must show that counsel failed to take some action.  She must show further that there was a reasonable probability that the outcome of the trial would have been different but for the alleged

28  error.  West has failed to demonstrate same on either Ground 4(A) or Ground 4(B).  A "negative" medical test result of course refers to the absence of the thing tested for, not to a "negative" result in the lay sense.

1          As to the claims rejected by the district court on the merits, under 28 U.S.C. § 2253(c),

2  a petitioner must make a "substantial showing of the denial of a constitutional right" in order

3  to obtain a certificate of appealability.  *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S.Ct.

4  1595, 1603-04, 146 L.Ed.2d 542 (2000); *Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir.

5  1999).  To satisfy this standard, the petitioner "must demonstrate that reasonable jurists

6  would find the district court's assessment of the constitutional claim debatable or wrong."

7  *Slack*, 529 U.S. at 484, 120 S.Ct. at 1604.

8          As discussed previously, the Court will grant a certificate of appealability as to the claim

9  challenging the sufficiency of the evidence in Ground 1 that was presented in the amended

10 petition,[49]  as jurists of reason would find the issue to be a debatable one.  The Court denies

11 a COA as to the claims in Grounds 2, 3 and 4, for the reasons outlined below.

12         ***Ground 2***

13         Jurists of reason would not find the rejection of Ground 2, regarding alleged inadequate

14 notice in the charging instrument, to be debatable or wrong.  At bottom, petitioner is

15 maintaining that the State was required to give notice of something that it was not required

16 to prove under Nevada law – that the victim died from a specific known cause rather than

17 from an unknown cause through criminal agency.  Moreover, petitioner's allegation that the

18 State changed theories in its closing argument is belied by rather than supported by the

19 record.   Reasonable jurists therefore would not find debatable or wrong this Court's

20 conclusion that the state supreme court's rejection of this claim was neither contrary to nor

21 an unreasonable application of clearly established federal law.  See text, *supra*, at 11-14.

22         ***Ground 3(A)***

23         Jurists of reason would not find the rejection of Ground 3(A) to be debatable or wrong.

24 In Ground 3(A), petitioner alleges that the State engaged in prosecutorial misconduct when

25

26

27         [49]A COA is denied as to further pursuit of the apparently unexhausted claim that petitioner sought to
raise for the first time in the reply as to Ground 1.  Reasonable jurists would not find the Court's rejection of

28 this late-breaking claim for counsel's failure to seek leave to amend the petition to be debatable or wrong.
See note 7, *supra*.

-32-

it argued in its closing that it did not have to prove specifically how West killed her mother. This claim, like Ground 2, proceeds from the erroneous premise that the State was required to prove a specific cause of death to prove *corpus delicti* under Nevada law. This premise is flawed. Reasonable jurists therefore would not find debatable or wrong this Court's conclusion that the state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. See text, *supra*, at 16-17.

### Ground 3(B)

Jurists of reason would not find the rejection of Ground 3(B) to be debatable or wrong. Petitioner alleges that the State engaged in prosecutorial misconduct when the State allegedly shifted the burden of proof to the defense in its closing argument. The prosecutor, at bottom, challenged the significance and import of sundry defense evidence in the case. Petitioner cites no apposite United States Supreme Court authority establishing that the argument was improper, and the argument would have been entirely proper in a federal criminal trial under established law. Reasonable jurists thus would not find debatable or wrong this Court's conclusion that the state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. See text, *supra*, at 17-28.

### Ground 3(C)

Jurists of reason would not find the rejection of Ground 3(C) to be debatable or wrong. Petitioner alleges that the State engaged in prosecutorial misconduct when the State argued in its closing that it was not required to prove where Christine Smith was murdered. The State in fact was not required to prove to the jury where Smith was murdered, as geographical jurisdiction is not an element of the offense and is not a question for the jury under Nevada law. A prosecutor's passing statement going to an issue that was not even before the jury hardly so infected the trial with unfairness as to make the resulting conviction a denial of due process. Reasonable jurists thus would not find debatable or wrong this Court's conclusion that the state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. See text, *supra*, at 18-21.

1    *Ground 3(D)*

2       Jurists of reason would not find the rejection of Ground 3(D) to be debatable or wrong.

3    Petitioner alleges that the State engaged in prosecutorial misconduct when the prosecutor

4    referred to defense counsel's argument that the plastic bag over the victim's airways may

5    have constituted a shroud as "almost blasphemous."  The matter was a molehill, if that, rather

6    than a mountain, and the prosecutor clearly did not seek to obtain a conviction in the guilt

7    phase by an appeal to religious bias.  Reasonable jurists thus would not find debatable or

8    wrong this Court's conclusion that the state supreme court's rejection of this claim was neither

9    contrary to nor an unreasonable application of clearly established federal law.  See text,

10   *supra*, at 21-22.

11   *Ground 4(A)*

12      Jurists of reason would not find the rejection of Ground 4(A) to be debatable or wrong.

13   Petitioner alleges that she was denied effective assistance of trial counsel when counsel

14   failed to obtain and use medical records from California from prior to the time that she lived

15   in Nevada.  Petitioner failed to tender competent medical evidence tending to demonstrate

16   a reasonable probability that introduction of the California medical records, if, *arguendo*

17   authentic, would have changed the outcome at trial.  Petitioner's argument as to the purported

18   significance of the records is based upon *petitioner's own lay assessment* as to what the in

19   truth sparse medical records signified.  Over and above the fact that petitioner is an interested

20   party in these proceedings, she clearly is not a competent witness to provide expert medical

21   testimony establishing the significance of medical records, whether radiology reports or

22   electrocardiogram results.  Reasonable jurists would not find debatable or wrong this Court's

23   conclusion that the state supreme court's rejection of this claim was neither contrary to nor

24   an unreasonable application of clearly established federal law.  See text, *supra*, at 23-30.

25   *Ground 4(B)*

26      Jurists of reason would not find the rejection of Ground 4(B) to be debatable or wrong.

27   Petitioner alleges that she was denied effective assistance of trial counsel when counsel

28   failed to have an expert review lab results in the Nevada medical records introduced into

evidence at trial.  Federal habeas counsel did not cite to or discuss any specifics in the medical records in question.  Counsel instead merely parroted back the lay petitioner's allegation in the state courts that the lab results included "negative results" that "present a picture of a very ill patient."  On the virtually nonexistent showing and argument made, reasonable jurists would not find debatable or wrong this Court's conclusion that the state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.  Anything that the lay petitioner herself said about the purported significance of the Nevada medical records again is not competent medical evidence.  See text, *supra*, at 30-31.

A certificate of appealability therefore will be denied as to these claims.

IT THEREFORE IS ORDERED that the petition shall be DENIED on the merits and that this action shall be DISMISSED with prejudice.

IT FURTHER IS ORDERED that a certificate of appealability is GRANTED as to Ground 1, except for the claim raised for the first time in the reply, and is DENIED as to Grounds 2, 3 and 4.

The Clerk of Court shall enter final judgment accordingly in favor of respondents and against petitioner, dismissing this action with prejudice.

DATED: September 9, 2010

 

_____
KENT J. DAWSON
United States District Judge

-35-